**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED DATA TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 3:16-cv-00139** |
| **SCOTT BYERS,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**
_____

## I.      INTRODUCTION

Plaintiff United Data Technologies, Inc. ("UDT"), a value-added technology reseller ("VAR") based in South Florida, hired Defendant Byers in 2009 and the other Defendants subsequently to start a Mid-South Region for UDT.  Byers and most of the other Defendants had worked in the VAR industry for years.  At the time of his hire, Byers shared with UDT's CEO, Henry Fleches, his lifelong dream of starting his own technology business.  Byers' idea was not just a pipe dream.  He already had a name for the business -- "Wrightcore," named after his best friend from childhood who had died in a car accident -- and had already reserved the name with the Secretary of State's office in 2008.  Although the parties discussed a noncompetition agreement, UDT never presented Byers with an agreement.   Byers therefore has no post-employment obligations to UDT.

After making the move to UDT, Byers recruited employees from other technology companies that he had worked with in the past or knew from the industry.  He opened a Chattanooga office populated by Defendants Frank Bryant, William Stovall, and Leon Davis, whom he recruited from another VAR.  The Mid-South Region eventually had approximately thirty-five employees.

1

Throughout his employment at UDT, Byers continued planning for Wrightcore, and periodically mentioned the business to UDT management. Byers anticipated that when he was ready to leave UDT, he would sit down with UDT's top leadership and discuss buying them out of the Mid-South Region or starting a UDT franchise so the parties could continue their business relationship. Before Byers could do so, Fleches called him on January 4, 2015 and fired him. UDT fired several other employees around this same time. As soon as Fleches hung up on him, Byers -- now free to launch his business -- began renting office space, hiring employees, and answering calls from customers who heard about his departure.

Byers' new business, Defendant Wrightcore, Inc., hired the former UDT employees who UDT fired. Over time, Byers hired other former UDT employees who resigned after Fleches demanded their loyalty following Byers' termination, and others from the industry. The seven individual Defendants named in this lawsuit were among the new hires. Three of these Defendants -- Hicks, Stinson, and Self -- had signed non-solicitation agreements with UDT. Byers and the other four have no post-employment obligations. As soon as it opened its doors, Wrightcore began competing with UDT, and many of the UDT customers who had worked with Byers and other members of his team for years followed them to Wrightcore. Wrightcore competed fairly. The three employees who were bound by non-solicits strictly adhered to their obligations. When UDT sued Wrightcore, Byers, and the other Defendants shortly after Wrightcore launched, it did so in an effort to financially cripple their new competitor and to disparage Wrightcore in the Nashville market. Defendants in this case have done nothing but lawfully compete with UDT. Defendants are entitled to summary judgment as to all of UDT's claims against them.

## II.     FACTUAL SUMMARY

Defendants Byers, Hicks, Stinson, Self, and Morse (the "Nashville Defendants"), prior to joining UDT, worked together at a technology company called Prosys. *See* Byers Dep. 10:23-11:6;

2

Hicks Dep. 14:17-15:5; Stinson Dep. 16:9-18; Self Dep. 54:22-55:2; Morse Dep. 14:14-15:25. Defendants Bryant, Stovall, and Davis (the "Chattanooga Defendants"), prior to joining UDT, worked together at a similar company called Teklinks. *See* Bryant Dep: 8:23-9:6; Stovall Dep. 6:21-7:6; Davis Dep. 9:11-10:7. In 2008, while employed at Prosys, Byers registered the name Wrightcore with the Secretary of State and created a business plan for his future company. *See* Byers Dep. 10:14-11:17, 83:17-25. In 2009, Byers was recruited to join UDT to launch UDT's Mid-South Region. *See* Amaro Dep. 15:17-16:8; Byers Dep. Ex. 74. Prior to hiring Byers, UDT had no significant business in Tennessee or Kentucky. Amaro Dep. 16:20-22, 17:3-9; Cline Dep. 23:8-10, 158:20-159:6, 190:12-14. During his recruitment by UDT, Byers was knew he wanted to start his own company, and so was not inclined to sign an agreement restricting his post-employment activities with UDT. Byers Dep. 10:23-11:23; Amaro Dep. 10:4-12:16. Byers discussed these concerns with UDT management. *See id.* Byers' offer letter from UDT reflected this discussion, as it contemplated that Byers would later enter into a "customary Confidentiality Non-Competition, Non-Solicitation, Non-Disclosure agreement," that would have a carve out for the states of Tennessee, Kentucky, and Alabama following his separation from UDT. *See id.* Byers Dep. Ex. 74. UDT never asked Byers to sign such an agreement, however, so Byers has no post-employment obligations.

Defendants Hicks, Stinson, and Self executed Restrictive Covenant Agreements ("RCA") upon joining UDT. The RCAs state that these Defendants are prohibited for one year after their employment with UDT terminates from:

> (a) solicit[ing], induc[ing], enter[ing] into any agreement with, or attempt[ing] to influence any individual who was or is an employee, consultant, representative or agent to [UDT] to terminate their relationship with [UDT] or to enter into any relationship with Individual or any affiliate of Individual, or interfer[ing] in any other way with the relationship of any employee, consultant, representative or agent to [UDT]; or

(b) solicit[ing] any customer or business contact of [UDT], or caus[ing] or participat[ing] in any actions which could result in the solicitation of such customer or business contact of [UDT] to purchase products or services related to a business described in subsection (a) above; or

(c) solicit[ing] any supplier to [UDT] to cease to provide any of supplier's products or services to [UDT] or reduce the extent of their relationship with [UDT]."

Hicks Dep. Ex. 21; Stinson Dep. Ex. 54; Self Dep. Ex. 52.  UDT did not require Defendant Morse to sign an RCA.  *See* Am. Compl. ¶ 22.  In 2012, UDT opened a satellite office in Chattanooga and hired the Chattanooga Defendants.  *See id.* ¶¶ 51-52; Bryant Dep. 15:6-7; Stovall Dep. 7:13-24; Davis Dep. 10:8-5.  None of the Chattanooga Defendants signed RCAs.  *See* Bryant Dep. 15:18-16:20; Stovall Dep. 41:11-42:5; Davis Dep. 13:12-14:5.

In or around 2015, Byers was preparing to go to UDT leadership in Miami to discuss buying out the Mid-South Region and launching his business.  *See* Byers Dep. 44:17-46:2, 46:20-47:47:16.  Byers re-reserved the name "Wrightcore, Inc.," which had lapsed, with the Secretary of State on November 9, 2015, and secured a commitment for funding from Nashville businessman John Ingram in December 2015.  Am. Compl. ¶ 28.  *See* Byers Dep. Ex. 76.  Before Byers could have a discussion with UDT, he was fired.  On January 4, 2016, Byers received a text message from Fleches informing him that his employment was being terminated effective immediately.  Cline Dep. 41:4-9.  Defendant Stinson was also fired.  *See* Hicks Dep. 102:2-7.  Amaro testified that UDT Mid-South employee Jackson Ware, in October or November of 2015, had traveled to UDT headquarters in Miami and told UDT management that Byers was "plan[ning to] tak[e] the company's employees and clients and separate from the business under kind of subterfuge and under false pretenses…"  *See* Amaro Dep. 28:22-30:15; 34:17-19; Cline 42:2-11.  UDT did not discuss these accusations with Byers or take any other steps to corroborate Ware's accusations.  *Id.* 30:16-18, 36:9-16, 43:7-15, 167:13-16.

Following his termination from UDT on January 4, 2016, Byers jumped into action, looking for office space and taking rapid steps to launch operations at Wrightcore. *See* Byers Dep. 57:2-58:16. Byers registered Wrightcore to do business on January 6, 2016. Am. Compl. ¶ 28. Defendants Hicks and Morse resigned from UDT on January 4, 2016, after learning that Byers had been fired. *See* Hicks Dep. 99:3-103:24; Morse Dep. Ex. 20. Defendant Self resigned from UDT on January 5, 2016. *See* Self. Dep. 65:21-66:13. Defendants Bryant, Stovall, and Davis resigned from UDT on January 6, 2016. *See* Amaro Dep. 49:11-54:1. Following their separation from UDT, the Defendants went to work for the newly-launched Wrightcore. *See, e.g.*, Am. Compl. ¶ 58. Wrightcore's first purchase order came on January 14, 2016. Byers Aff. ¶ 7.

### III. LEGAL STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of pointing to portions of the record which demonstrate that there is no genuine dispute of material fact. *Id.* at 323. The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325. This may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the nonmoving party's evidence to show why it does not support a judgment for the nonmoving party. 10a CHARLES A. WRIGHT, *et al.*, Federal Practice and Procedure § 2727 (2d ed. 1998); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 2479 (6th Cir. 1989).

Once the moving party meets that burden, the non-moving party must produce evidence which shows that a "reasonable jury could find for [the non-moving party]." *Combs v. Int'l Ins. Co.*,

354 F.3d568, 576 (6th Cir. 2004) (internal quotation omitted).  Although the evidence is viewed in the light most favorable to the non-moving party, that party must demonstrate more than the "mere possibility" of a factual dispute.  *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986); *see also Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations."  *Smith v. City of Chattanooga*, No. 1:08-CV-63, 2009 WL 3762961, at *2 (E.D. Tenn. Nov. 4, 2009) (emphasis added).[1]  Accordingly, summary judgment will be appropriate where the moving party identifies portions of the record that show that there is no genuine issue of material fact and the non-moving party fails to produce evidence that shows more than the mere possibility of a factual dispute.  *See, e.g.*, *Gregg*, 801 F.2d at 863.

## IV.    ARGUMENT PERTAINING TO UDT'S CLAIMS AGAINST DEFENDANTS

Summary judgment is appropriate in this case because all of the claims in Plaintiff's Amended Complaint fail as a matter of law.[2]

### A.    COUNT I - Misappropriation of Trade Secrets

UDT claims that the Defendants wrongfully misappropriated trade secret information of UDT, and that they are now wrongfully using such trade secrets to market services to UDT customers on behalf of Wrightcore, and to UDT's detriment.  Am. Compl. ¶¶ 57-58.  UDT pleads this count under both Florida and Tennessee law.  This claim fails against all of the Defendants.  First, the Defendants are not subject to Florida law.  Second, UDT has failed to produce any evidence  supporting its claim.

#### 1.  The Defendants Are Not Subject to Florida Law.

---

[1] True and correct copies of unpublished cases are attached hereto as **Collective Exhibit 1**.
[2] Defendants address UDT's claims below out of order in an effort to organize them most logically for the Court's ease of review.

6

Defendants are residents of Tennessee whose alleged actions occurred solely while working for UDT or Wrightcore in Tennessee. *See* Am. Compl. In a diversity case such as this, the court is to apply the law of the forum state, including the forum's choice of law rules. *See, e.g.*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Mackey v. Judy's Foods, Inc.*, 654 F. Supp. 1465, 1468 (M.D. Tenn. 1987). Where the claim at issue sounds in tort, Tennessee conflicts law applies the substantive law of the state where the wrong occurred. *See Franklin v. Wills*, 217 F.2d 899, 900 (6th Cir. 1954). Since Tennessee is the place where their alleged wrongdoing occurred, the Defendants are not subject to Florida law.

The RCAs executed by Defendants Hicks, Stinson, and Self provide that the "Agreement[s] will be construed, interpreted and applied in accordance with the laws of the United States of America and the State of Florida." This narrow choice of law provision, by its very terms, applies only to matters concerning the construction, interpretation and application of the RCAs. *See, e.g.*, *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) (internal citations omitted) ("It is the Court's duty to enforce contracts according to their plain terms. Further, the language used must be taken and understood in its plain, ordinary and popular sense. The courts, of course, are precluded from creating a new contract for the parties."). UDT's claim for violation of Fla. Stat. § 688.001, *et seq.* does not reference the RCAs signed by Hicks, Stinson, and Self, and clearly does not concern the construction, interpretation, or application of those RCAs. *See* Am. Compl. ¶¶ 80-85. Accordingly, UDT's claim for violation of Fla. Stat. § 688.001, *et seq.* fails as a matter of law.

> **2. Count I Also Fails as a Matter of Law Because UDT Has Failed to Identify the Trade Secrets Defendants' Allegedly Misappropriated And Has Failed To Produce Evidence Of Such Alleged Misappropriation.**

UDT's claim for misappropriation of trade secrets under the TUTSA, Tenn. Code Ann. § 47-25-1701, *et seq.,* also fails.[3] The elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff. *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, No. 3:06-CV-170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006). A "trade secret" is defined as "information…that…[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means…and…[that i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Tenn. Code Ann. § 47-25-1702(4). "Misappropriation" is defined as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "[d]isclosure or use of a trade secret of another without express or implied consent by a person" under certain enumerated circumstances. Tenn. Code Ann. § 47-25-1702(2).

The plaintiff bears the burden in a trade secrets case, not only to show the existence of a trade secret, but also to prove that trade secrets were communicated to the defendant in the course of a confidential relationship and are being used or disclosed by the defendant to the plaintiff's detriment. *See Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 588 (Tenn. Ct. App. 2001). In pleading trade secret misappropriation, "[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (emphasis added). Courts adhere to a "reasonable particularity" standard, which "requires that the alleged trade secret be described with adequate specificity to inform the defendants what [they are] alleged to have misappropriated." *Dura Global Techs., Inc. v. Magna Donnelly Corp.*, No. 07-CV-10945-DT, 2008 WL 2064516, at *2 (E.D. Mich. May 14, 2008); *see*

---

[3] The definition for misappropriation in Florida is virtually identical to that in Tennessee since both states have adopted the framework of the Uniform Trade Secrets Act. For the sake of brevity, Defendants will focus on Tennessee's articulation of the law.

8

*also Black & Decker (U.S.) Inc. v. Techtronic Indus. Co., Ltd.*, Nos. 1:08-cv-01002-JDB/egb, 1:07-cv-01201-JDB/egb, 2009 WL 3762947, at *1 (W.D. Tenn. May 14, 2009) (applying *Dura Global's* "reasonable particularity" standard). The court in *Dura Global* found that "identifying areas to which their trade secrets relate" and using "general terms, such as 'business strategies and inside information[,]'" did not satisfy this burden. *Dura Global*, 2008 WL 2064516, at *2.

UDT has not met its burden. There is no evidence that any of the Defendants misappropriated trade secrets. In discovery, the Defendants asked UDT to produce any evidence that the Defendants misappropriated trade secrets. Specifically, Defendants asked: "Produce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Wrightcore, Byers, Hicks, Stinson, Morse, Self, Bryant, Stovall, and/or Davis wrongfully misappropriated trade secrets of UDT." UDT's response was: "Plaintiff shall produce any such non-privileged documents. Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been denied access." (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 8.) Despite this response, no responsive documents have been forthcoming.

UDT employee Ware testified in his deposition that the Defendants took UDT's trade secrets. Ware could not, however, identify any of UDT's trade secrets that were taken. Ware testified that he has no knowledge of whether any of the Defendants took any information at all from UDT's internal share drive. Ware Dep. 88:25-89:8. UDT has seen no evidence that any of the Defendants printed or otherwise retained any schematics, diagrams, or customer lists from UDT. Cline Dep. 121:15-22. UDT's President, Amaro, admitted that he is not aware of Defendants taking any UDT information or property. *Id.* 60:5-8. This testimony, along with UDT's failure to produce any documents supporting its claim of misappropriation, establishes that there is no evidence whatsoever to support this claim.

**B.      COUNT III - Breach of Restrictive Covenant Agreements**

In its Amended Complaint, UDT claims that Defendants Hicks, Stinson, and Self breached the terms of their respective RCAs by taking and using confidential information of UDT, unlawfully soliciting UDT's employees and customers (either directly or through Defendant Byers), and unlawfully interfering with UDT's relationships with its suppliers. Am. Compl. ¶ 77. This claim fails as a matter of law because there is no evidence whatsoever that Defendants Hicks, Stinson, or Self violated the terms of their RCAs.

### 1. Count III Fails as a Matter of Law Because UDT Has Failed to Establish Breach or Damages.

The elements of a breach of contract under Florida law are: (1) a valid contract; (2) a material breach; and (3) damages. *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So.2d 737, 740 (Fla. Dist. Ct. App. 2000) (internal citations omitted). For purposes of this motion, Defendants concede that the RCAs are enforceable. However, the lack of evidence of breach and damages resulting from breach require dismissal of this claim.

UDT has produced no evidence that any of the Defendants with RCAs, either directly or indirectly, has solicited its customers. While it is undisputed that certain former customers of UDT now do business with Wrightcore, UDT's unfounded assumption that Defendants Hicks, Stinson, and/or Self therefore must have solicited those entities simply does not constitute evidence of breach. In its document requests to UDT, Defendants requested that UDT "[p]roduce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Hicks, Stinson, and Self solicited UDT customers either during or after their employment with UDT." UDT responded, " . . . Plaintiff shall produce any such non-privileged documents. Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been denied access." (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 19.) No responsive documents have been forthcoming, and UDT has put forth no evidence in support of its

claim that Defendants are in possession of such documents, or that they have denied UDT access to anything.

UDT further claims that Defendants Hicks, Stinson, and Self indirectly breached their RCAs indirectly, by having Byers solicit clients of UDT on their behalf. *See* Am. Compl. ¶ 77. UDT cannot establish this claim, either. This allegation represents an attempt to transfer to Byers the non-solicitation restrictions imposed on Hicks, Stinson, and Self. Defendants readily admit that Byers solicited UDT customers after launching Wrightcore. This was permissible since he was not subject to an RCA. Merely alleging that Byers did this solicitation on behalf of Hicks, Stinson, and Self in order to subject them to liability for breach does not make it so. There is no evidence supporting the claim that Hicks, Stinson, and Self "indirectly" violated their nonsolicitation obligations by using Byers to solicit on their behalf.

In fact, the record negates UDT's claim of "indirect" breach. In an effort to avoid a lawsuit, Byers instructed all Wrightcore employees to adhere strictly to any applicable non-solicitation agreements. Wrightcore's practice was that Byers, who was free to compete with UDT, was exclusively in charge of soliciting business for Wrightcore. Wrightcore employees were instructed to direct any inquiries received from clients they had worked with at UDT to Byers to avoid even the appearance of impropriety. *See* Hicks Dep. 40:19-25, 42:21-43:1, 141:17-25, 170:18-6. The record establishes that they strictly followed this practice. *See* Stinson Dep. Ex. 56 (email from Byers to Wrightcore employees dated Feb. 16, 2016, confirming that client Delozier reached out to Wrightcore); Caudle Dep. Ex. 51 (email from client International Brotherhood of Electrical Workers ["IBEW"] 429 to Byers dated Jan. 5, 2016, informing Byers that IBEW 429 would like to continue doing business with Hicks and Wrightcore); Hicks Dep. Exs. 37 (emails from Hicks to Byers dated Jan. 12, 2016, confirming whether he may contact clients Frost-Arnett, Ensworth School and IBEW 429) and 47 (email from Byers to Wrightcore employees dated Feb. 19, 2016, encouraging all to

11

help increase attendance at a Wrightcore marketing event but not to violate any non-solicitation agreements); Ex. 87 to Byers Dep (email from client Silverdale Baptist Church to Byers dated Jan. 12, 2016, informing Byers that Silverdale Baptist Church would like to be a client of Wrightcore). This evidence upends UDT's theory of wrongdoing. There is no evidence to support UDT's claim that Defendants Hicks, Stinson, or Self breached their nonsolicitation obligations by having Byers do what those Defendants could not do themselves.

UDT further cannot point to a single email or other document showing that any of the Defendants with RCAs solicited any supplier of UDT to "cease to provide any of supplier's products or services to [UDT] or to reduce the extent of their relationship with [UDT]," in violation of the RCAs. Defendants requested that UDT "[p]roduce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Hicks, Stinson, and/or Self breached their Restrictive Covenant Agreements with UDT." UDT responded, "Plaintiff shall produce any such non-privileged documents. Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been denied access." (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 10.) No responsive documents have been forthcoming, and UDT has put forth no evidence in support of its claim that Defendants are in possession of such documents, or that they have denied UDT access to anything. It is not disputed that Wrightcore partners with suppliers who worked with UDT. This fact, however, in no way proves that Defendants Hicks, Stinson, or Self, or Byers' on their behalf, solicited such suppliers to cease or reduce their business relationship with UDT.

Finally, UDT claims that Hicks, Stinson, and Self misappropriated its Confidential Information, in violation of the RCAs. The evidence in the record disproves these allegations. Specifically, UDT claims that Defendant Hicks returned his UDT laptop without a hard drive. Am. Compl. ¶ 44, Ware Dep. 122:9-19. Hicks testified that he did so because the hard drive that came on

his UDT laptop was too small for his purposes, and so Hicks, at his own expense, purchased a larger hard drive to use in his UDT laptop. Upon his separation from UDT, Hicks removed all UDT information from the hard drive and placed the removed data on a DVD that was returned to UDT. The hard drive in question was then securely erased, and no UDT documents or other information remain on the hard drive. *See* Hicks Dep. 28:13-29:22, 117:20-119:1, 120:17-24. Hicks explained this to UDT when he returned his laptop. *See id.* 116:9-22. UDT has not alleged that Hicks had anything that belonged to UDT on this hard drive; in fact, Ware testified that he had no idea what was on the hard drive. *Id.* 123:1-4. Likewise, UDT's corporate representative had no additional information regarding Hicks' alleged failure to return his hard drive. *See* Cline Dep. 119:25-121:12. Finally, UDT claims that Hicks had a computer belonging to former UDT employee Shea Ghertner and that "upon information and belief he copied and then returned" Ghertner's computer to UDT. Am. Compl. ¶ 45. Hicks testified that he helped Ghertner remove photographs and other personal information from her computer before returning it to UDT for her. Hicks Dep. 120:3-13. He did not remove the hard drive from her computer. Hicks Dep. 119:8-10. And as stated above, UDT has not produced any evidence that Hicks "copied" Ghertner's computer, as alleged. UDT cannot show that Hicks misappropriated Confidential Information, as that term is defined in the RCA.

UDT further claims that Defendant Self wiped his hard drive and encrypted his laptop before returning it to UDT so it could not be unlocked. Cline Dep. 120:22-23. This is disproven by the testimony. Self testified that when he met with UDT employees Jesus Pena and Tony Best on January 5, 2016 as he was leaving UDT, he told them that his laptop had been encrypted for years ("for the last however many years I have had it"), and that he had given the password that would allow it to be accessed to multiple UDT employees. *See* Self Dep. 28:5-15. Self testified that he had originally encrypted the laptop in case it was ever stolen -- not for any nefarious purpose. *Id.* 29: 15-22. Self further testified that he provided the password to Pena and Best and he invited them

to contact him if they had any problems accessing the device.  *See* Self Dep. 28:5-29:2, 30:18-25.

UDT has produced no evidence whatsoever that Self's hard drive contained any UDT Confidential

Information, that Self had access to any of the information contained on the encrypted hard drive

after his separation from UDT, or that he wrongfully used any such information to UDT's detriment.

UDT alleges that forensic examination of the laptop computer that Stinson used revealed

files named "Wrightcore Agreement.pdf" and "Wrightcore Equipment List."  Am. Compl. ¶ 46.

UDT claims that "[i]t is clear that Stinson, while employed by UDT, was working on creating

Wrightcore and assisting in the scheme to use Confidential Information of UDT to start Wrightcore,

using UDT equipment."  *Id*.  This is not clear at all.  First, UDT has never produced the results of the

alleged forensic examination to Defendants, despite their multiple requests.  Second, merely because

two Wrightcore documents were found on Stinson's computer does not mean that Stinson used

UDT's Confidential Information, as that term is defined in the RCA.  That is a leap of logic that is

unsupported by any evidence.

Finally, UDT alleges that Hicks, Stinson, Morse (who was not bound by an RCA), and Self

"stored UDT Confidential Information" on cloud storage systems and retained the passwords for

accessing these systems when they left.  Am. Compl. ¶ 50.  But there is no evidence in the record

substantiating UDT's claim.

Also defeating its claim for breach of contract, UDT has not identified any damages

attributable to the alleged breach.  This is an essential element of any breach of contract claim.  In

discovery, Defendant Wrightcore asked UDT in its interrogatories:

> As to each element of damages you contend you have sustained as a result of the
> allegations in your Complaint, state the dollar amount of such damages; the factual
> basis and legal theory upon which such damages are claimed; the method by which
> such damages are calculated. . . . the identify of all facts, documents, conversations,
> communications, persons, witnesses and other evidence upon which you intend to
> rely to support each claim for damages; and identify all documents and records which
> support your claim for these damages.

UDT responded: "Plaintiff is unable to quantify its damages at this stage of the litigation because Defendants misappropriated company information and has in its possession knowledge of the business it has diverted and/or knowingly procured. Plaintiff will amend this answer as such information becomes available." *See* Plaintiff's Responses and Objection to Defendant Wrightcore, Inc.'s First Set of Interrogatories and Requests for Production, No. 7. UDT has not supplemented this response. UDT has produced a document alleging that it has been damaged in the amount of $5,536,357 for all of Defendants' wrongs alleged in the Amended Complaint. Cline Dep. Ex. 9. But it has not produced any evidence that causally connects the Defendants' actions to the damages UDT alleges. Further, UDT calculated its damages through the year 2022, even though the RCAs that Hicks, Stinson, and Self allegedly breached were only in effect for one year post-employment. Accordingly, UDT's claim of breach of contract against Defendants Hicks, Stinson, or Self. Count III therefore fails as a matter of law.

### 2. Defendants Are Entitled to an Award of Their Reasonable Attorneys' Fees and Costs.

The RCAs contain a provision awarding attorneys' fees to the prevailing party in any dispute seeking to enforce the agreement. Specifically, Section 24 of the RCA provides as follows:

> In any action or proceeding brought to enforce any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs from the other party to the action or proceeding. For purposes of this Agreement, the "prevailing party" shall be deemed to be that party who obtains substantially the relief sought, whether by settlement, mediation, judgment or otherwise, and "attorneys' fees" shall include, without limitation, the actual attorneys' fees incurred in retaining counsel for advice, negotiations, suit, appeal or other legal proceeding, including mediation and arbitration.

Hicks Dep. Ex. 21; Stinson Dep. Ex. 54; Self Dep. Ex. 52. Because Defendants Hicks, Stinson, and Self are entitled to a judgment in their favor on UDT's claim for breach of the RCAs, they are further entitled to an award from UDT of their reasonable attorneys' fees and costs incurred in defending this claim.

15

## C.    COUNT VII - Inducement of Breach of Contract

UDT alleges, pursuant to Tenn. Code Ann. § 47-50-109, that Defendants Byers and Wrightcore induced Defendants Hicks, Stinson, and Self to breach their RCAs with UDT.  Am. Compl. ¶ 100.  This claim fails as a matter of law as against both Defendants Byers and Wrightcore. First, this claim fails as against Byers in his individual capacity because UDT has failed to bring forth any evidence whatsoever that Byers acted outside the general range of his authority as President of Wrightcore, or in a manner not substantially intended to further Wrightcore's interest. Second, this claim fails as against both Defendants Byers and Wrightcore because UDT cannot meet its burden to show, at a minimum, that Byers and Wrightcore intended to induce a breach of the RCAs, that they did so maliciously, or (most importantly) that the RCAs were ever even breached.

### 1.    Count VII Fails as a Matter of Law Against Defendant Byers in His Individual Capacity.

UDT's claim for inducement of breach against Byers in his individual capacity fails as a matter of law.  Because a corporation acts only through its agents and employees, a corporate director, officer or employee generally cannot be individually liable for inducement to breach a corporate contract, including an employment agreement, so long as he is acting in furtherance of the corporate interest.  *Forrester v. Stockstill*, 869 S.W.2d 328, 334-335 (Tenn. 1994).  To bring such a claim against Byers individually, UDT would have to allege that he acted outside the general range of his authority as corporate director, officer, or employee, or acted in a manner not substantially intended to further Wrightcore's interests.  See *Dolphin Offshore Partners, L.P. v. Indus. Res. Corp.*, No. 3:05-CV-242, 2005 WL 3434939, at *1 (E.D. Tenn. Dec. 14, 2005) (citing *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 782 (Tenn. 2000)); *see also Western Microtechnology v. Goold Elecs. Corp.*, No. 91 C 7119, 1993 WL 424244, at *12 (N.D. Ill. Oct. 15, 1993) (dismissing tortious interference claim where the plaintiff failed to allege that the individual defendant's actions were contrary to the interests of his corporate employer).

16

In *Western Microtechnology*, the parties agreed that the plaintiff, Western, would sell computer parts to the defendant, Goold Electronics, for resale to Sears. *Western Microtechnology*, 1993 WL 424244, at *1. Goold Electronics instead sold the parts on the gray market and never paid Western. *Id*. at *1-2. Western sued for breach of contract and claimed that Goold Electronics' president, Oliver Goold, induced the breach, acting outside his corporate authority. *Id*. at *2. The court dismissed the inducement claim because Western failed to allege that Goold's actions were contrary to the interests of his corporate employer, Goold Electronics. *Id*. at *5. Noting that Goold owned half of Goold Electronics' stock, the court concluded that "[h]is interest and those of his company [were] most likely one and the same." *Id*. at *5. Because Western failed to allege that he acted outside his authority, the court dismissed the inducement claim against Goold.

There is no evidence that Byers acted outside the general range of his authority as President of Wrightcore or acted in a manner not substantially intended to further Wrightcore's interests. Accordingly, UDT's claim for inducement of breach against Byers in his individual capacity fails as a matter of law.

### 2. Count VII Fails as a Matter of Law Against Both Defendants Byers and Wrightcore Because UDT Has Failed to Meet Its Burden to Show Evidence of Intent, Maliciousness, and Underlying Breach.

Tenn. Code Ann. § 47-50-109 makes it unlawful for any person "by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto . . . " The elements of a cause of action for inducement of breach of contract in Tennessee are: (1) the existence of a legal contract; (2) knowledge of the existence of the contract on the part of the wrongdoer; (3) there must be an intention to induce its breach; (4) the wrongdoer must have acted maliciously; (5) a breach of the contract; (6) the act complained of must be the proximate cause of the breach of the contract; and (7)

17

there must have been damages resulting from the breach of the contract.  *Myers v. Pickering Firm, Inc*., 959 S.W.2d 152, 158 (Tenn. Ct. App. 1997).

As set forth in Section B, above, UDT cannot show that Hicks, Stinson, and Self breached their RCAs.  Further, UDT cannot show that Byers or Wrightcore acted with intent to cause any breach of the RCAs or that they acted with malice.  In fact, the record makes clear that Byers took affirmative steps to prevent any Wrightcore employees post-employment obligations to violate his or her restrictive covenant agreements.  *See, e.g.*, Hicks Dep. 141:17-25, Ex. 47.

In its Amended Complaint, UDT alleges that Byers induced employees of UDT's Nashville office to quit UDT and join him at Wrightcore by loaning one of them money and buying another a truck.  *See, e.g.*, Am. Compl. ¶¶ 33.   Byers loaned Matt Saier money in 2010 -- years before he left UDT to form Wrightcore.  Byers Aff. at ¶ 4.  And Byers and Saier were more than mere work colleagues; they were good friends, having played baseball together in college.  *Id*.  In 2014, Byers made a downpayment on a truck for Morse, as a birthday gift when Morse turned 50.  Byers Aff. ¶ 5.  Byers did these kindnesses not to induce Saier or Morse to do anything, but out of generosity to his longtime friends.  *Id.* at ¶ 6.

In its discovery requests to UDT, Defendants requested that UDT "[p]roduce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Wrightcore and/or Byers induced [Defendants Hicks, Stinson, and/or Self] to breach their Restrictive Covenant Agreements with UDT."   UDT responded, "Plaintiff shall produce any such non-privileged documents.  Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been denied access."   (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 14.)  Despite this response, no responsive documents have been forthcoming, and UDT has produced no evidence in support of its claim that Defendants are in

18

possession of such documents, or that they have denied UDT access to anything. Accordingly, UDT's claim for inducement of breach fails in its entirety as a matter of law.

## D.      COUNT V - Tortious Interference

UDT lodges a claim for tortious interference against Byers and Wrightcore. Am. Compl. ¶ 89. For all intents and purposes, this claim is duplicative of UDT's claim against the same Defendants for inducement of breach.[4] As set forth in Section C above, this claim also fails. UDT's claim against Byers in his individual capacity fails because UDT cannot show that Byers acted outside his authority or in a manner not substantially intended to further Wrightcore's interest. This claim fails as against both Byers and Wrightcore because UDT cannot show that they intended to induce a breach of the RCAs, or that the RCAs were breached. In its document requests to UDT, Defendants requested that UDT "[p]roduce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Wrightcore and/or Byers tortiously interfered with UDT's rights under the Restrictive Covenant Agreements at issue in this case." UDT responded, "Plaintiff shall produce any such non-privileged documents. Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been denied access." (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 12.) Despite this response, no responsive documents have been forthcoming, and UDT has produced no evidence in support of its claim that Defendants are in possession of such documents, or that they have denied UDT access to anything. Accordingly, UDT's claim for tortious interference must fail.

## E.      COUNT II - Breach of Employee Duty of Loyalty

---

[4] The basic elements which establish a prima facie tortious interference with a business relationship are the existence of a valid business relation or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. *New Life Corp. of Am. v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 927 (Tenn. Ct. App. 1996) (quoting *Kan Const. & Cleaning Corp. v. Tatum*, No. 01A01-9304-CV-00150, 1993 WL 434741, at *4 (Tenn. Ct. App. Oct. 27, 1993) (quoting 45 Am.Jur.2d *Interference* 50 (1969)).

UDT's claim that Byers, Hicks, Stinson, Self and Morse breached their employee duties of loyalty fails against all of these Defendants because UDT cannot show that these Defendants engaged in wrongful conduct while employed by UDT. Tennessee law makes clear that "[a]n employee 'must act solely for the benefit of the employer in matters within the scope of his employment'" and "'must not engage in conduct that is adverse to the employer's interests.'" *Efird v. Clinic of Plastic and Reconstructive Surgery, P.A.*, 147 S.W.3d 208, 220 (Tenn. Ct. App. 2003) (internal citation omitted). However, "an employee does not breach a duty of loyalty to his employer by making preparations to compete while still employed, for instance by filing a corporate charter for a new competing company." *Int'l Sec. Mgmt. Group, Inc. v. Sawyer*, No. 3:06CV0456, 2006 WL 1638537, at *11 (M.D. Tenn. Jun. 6, 2006). An employee "may also, while still employed, inform current or potential clients of the company that he intends to leave and what his future plans are without breaching any duty of loyalty." *Id.* The fiduciary duty of loyalty applies only during the employment relationship. *See Knott's Wholesale Foods, Inc. v. Azbell*, Nos. 01A-01-9510-CH-00459, 93-19, 1996 WL 697943, at *3 (Tenn. Ct. App. Dec. 6, 1996) ("During the employment relationship, an employee has a fiduciary duty of loyalty to the employer."). "After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed . . . Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." *Knott's*, 1996 WL 697943, at *4 (quoting Restatement (Second) of Agency § 393, cmt. e).

20

There is no evidence whatsoever that Defendants were operating Wrightcore while they were employed by UDT.  Ware Dep. 53:5-8; Cline Dep. 168:16-22; Amaro Dep. 41:24-42:3.  UDT has produced no evidence that Wrightcore received any revenue before Byers' termination.  UDT has produced no evidence suggesting that the Defendants informed any UDT customers that they were forming a new company while employed at UDT, or that Defendants informed any UDT clients that they could not do business with UDT because they were going to start Wrightcore.  UDT's corporate representative testified that UDT has not found a single document to support the allegation that Byers was stealing business or orchestrating a group of employees to leave UDT before he was terminated.  *Id.* 118:7-14.  In its document requests to UDT, Defendants requested the UDT "[p]roduce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Byers, Hicks, Stinson, Morse, and/or Self breached their employee duties of loyalty, good faith, and trust to UDT."  UDT responded, "Plaintiff shall produce any such non-privileged documents.  Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been denied access."   (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 9.)  Despite this response, no responsive documents have been forthcoming, and UDT has produced no evidence in support of its claim that Defendants are in possession of such documents, or that they have denied UDT access to anything.

Although there is evidence that Byers was preparing to leave UDT and to launch Wrightcore, this evidence does not support UDT's claim of breach of fiduciary duty against Byers.  The law allows employees to make preparations to leave their employers, even if they are leaving to compete.  UDT alleges that forensic analysis had revealed that a file called "WrightCore Business Plan.doc" had been on a UDT laptop Byers returned upon his separation from UDT, and that the file

was created while Byers was employed by UDT.  Am. Compl. ¶ 41.[5]  UDT alleges that forensic

analysis also revealed that files labeled "Wrightcore Agreement.pdf" and "Wrightcore Equipment

List.xl[s]" had existed on Defendant Stinson's computer and had been deleted.  *Id.* ¶ 46.  Despite

requests from Defendants, UDT has not produced the alleged forensic analyses or any other

evidence to support its claims of wrongdoing.  If these alleged documents were created during the

Defendants' employment at UDT and in preparation of starting Wrightcore, this does not, as a matter

of law, constitute a breach of Defendants' duty of employment loyalty to UDT.  *See Int'l Sec. Mgmt.*

*Group, Inc.*, 2006 WL 1638537, at *11 ("[A]n employee does not breach a duty of loyalty to his

employer by making preparations to compete while still employed, for instance by filing a corporate

charter for a new competing company").

In support of its allegations of a breach of fiduciary duty, UDT will likely rely on the

testimony of its employee, Ware.  In particular, UDT may highlight statements that Byers allegedly

made to Ware.  Ware testified that Byers told him that he was starting "another company that does

the same thing that UDT does."  Ware Dep. 29:4-12.  Ware further testified that during the summer

of 2015, Byers walked down the hallway of UDT saying, "you may leave UDT on Friday and come

in, and it might be Scott Byers, Inc. on Monday."  Ware Dep. 29:11-16.  Ware admitted that at the

time he thought this was a joke, undercutting his claim that Byers told him he was starting a

competing company.  *Id.* 29:17-20.  Ware then testified that in late summer 2015, Byers told him

that he was going to name his new company after one of his friends who had died.  *Id.* 29:21-30:6,

31:3-17.  Ware claims that during another conversation, Byers told him the name of his new

company.  *Id.* 31:25-32:7, 32:8-12.  Curiously, Ware later testified that he did not remember whether

Byers ever told him the name of the company.  *Id.* 33:2-5.  Ware also testified to another exchange

that allegedly occurred in October of 2015.  During this conversation, Ware alleges that Byers said,

---

[5] In fact, Byers created his Wrightcore business plan in 2008, and revised it in 2015.  Byers had actually shared excerpts of this document with Amaro while employed at UDT.  Byers Aff. at ¶ 2.

"Jackson, I need to know if I can trust you. I need to know if you're in or if you're out." *Id.* 33:6-17. Ware claims that he responded by asking questions about the business, such as who was involved. *Id.* 33:18-34:17. Ware cannot recall the answers Byers provided in response. *Id.* 34:18-24. Ware did recall, however, that Byers explained that John Ingram was putting money into the business. *Id.* 35:5-10.

Even if Byers had said all these things to Ware, they are not sufficient to demonstrate a breach of Byers' fiduciary duty of loyalty to UDT. Morever, additional testimony makes clear that Byers did not solicit Ware to help him plan for Wrightcore. Ware admitted that he could not identify any steps Byers had taken to form the new company. *Id.* 55:4-9. Ware did not know if Byers received any funding for the new company. *Id.* 55:10-13. He did not know whether Byers had incorporated the company, hired employees, or bought equipment. *Id.* 57:3-15. And he claimed that he never heard the name Wrightcore before Byers' termination. Ware Dep. 53:14-17, 54: 7-15. That Byers allegedly shared information with Ware about the business during their employment at UDT is of no moment. Byers was within his rights under the law to prepare to leave and even to discuss his preparations with other UDT employees. There is no evidence that Byers told UDT customers of his plan to leave UDT and start his own competing business, even though doing so is also permissible under Tennessee law. UDT has produced no evidence that Byers solicited any UDT customers while he was employed by UDT. UDT has produced no evidence in support of its allegation that while still employed by UDT, Byers solicited UDT employees to join him at Wrightcore. Ware's "in or out" testimony does not amount to solicitation since it is, at best, an ambiguous statement that could have referred to any number of topics.

As proof of the Defendants' violation of their duties of loyalty, UDT's corporate representative claims that Morse "bragged" in his January 5 exit interview with Fleches, "how Scott had been planning this for a long time . . . [T]hat it was a well-planned event, and that 90 percent of

23

the engineers were going to go with Byers, and that UDT would be out of business in three months . . . [That] Byers deserves the opportunity . . . [because] he's been wanting this for a while . . . [T]hat all the offers to the engineers were already prepared and ready to go…" Cline Dep. 36:18-37:8-13, 105:14-23, 107:10-14. The information Morse allegedly shared with Fleches during his exit interview does not point to wrongdoing. As stated before, making plans to leave, even to compete, is permissible under the law. And Morse did not intend his transparency with Fleches to be construed as "bragging;" rather, he met with Fleches to help him and other UDT management transition the services-related activities and information to the new manager as a good faith gesture. Morse Aff. ¶ 2. Further, Morse's transparency about Byers' plans corroborates Byers' testimony that Byers intended to discuss his departure plans with UDT and to try to negotiate an amicable separation or a continuing business relationship.

Although UDT asserts that Byers solicited UDT employees to join him at Wrightcore before his termination from UDT, all the Defendants testified that Byers did not ask them to join Wrightcore until after he had been terminated. *See* Bryant Dep. 17:24-18:7; Morse Dep 71:8-10, 73:3-74:2; Stovall Dep. 16:19-17:3, 17:18-24; Davis Dep. 44:14-45:10; Hicks Dep. 102:8-103:24; Stinson Dep. 33:14-17; Self Dep. 65:21-66:13. Ware did not testify as to any invitation by Byers to join Wrightcore prior to Byers' termination; the alleged "in or out" comment certainly could not be construed as a solicitation to become employed by Wrightcore. Cline further testified that former UDT employee Andy Winford, at his January 5, 2016 exit interview on, said that he had committed to Byers weeks before. Cline Dep. 38:20-39:8, 109:19-110:4. But Winford had actually committed to Byers <u>years</u> before, when they were at Prosys and Byers had floated the idea. Byers Aff. ¶ 3. Cline also testified that UDT employee Sarah Holstein, when greeted by UDT management after Scott's termination, remarked, "I thought all this was worked out." *Id.* 39:9-12. This alleged response is ambiguous at best; it does not establish that Byers solicited her to leave UDT and work

for Wrightcore. None of these alleged statements establish breach by Byers, and therefore UDT's claim of breach of the duty of loyalty against Byers fails.

Further, UDT cannot point to any evidence in the record that Defendants Hicks, Stinson, Self, or Morse breached their duties of employment loyalty to UDT. There is no evidence that they solicited other UDT employees or customers, or that they acted contrary to UDT's interest during their employment. UDT's claim of breach of fiduciary duty fails as a matter of law against Hicks, Stinson, Self, and Morse as well.

**F.     COUNT VIII - Breach Of Tennessee Common Law of Unfair Competition**

UDT claims that Defendants Byers, Wrightcore, Hicks, Stinson, Self, and Morse breached Tennessee's common law of unfair competition in that: (1) Defendants Hicks, Stinson, and Self violated their respective RCAs; (2) all of these Defendants breached their duties of employment loyalty to UDT with the purpose and intent of harming, disrupting, and interfering with UDT's business in Tennessee; and (3) Defendants Byers and Wrightcore enticed, solicited, and induced Defendants Hicks, Stinson, and Self to breach their RCAs with UDT. Am. Compl. ¶¶ 103-105. What UDT has alleged does not constitute breach of the law of unfair competition.

Tennessee's common law regarding unfair competition is "'not well developed.'" *Act for Health v. Case Management Assoc., Inc.*, 128 F.Supp.3d 1020, 1036 (E.D. Tenn. 2014) (citing *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1243 (6th Cir. 1996)). The *Act for Health* court articulated three elements of the tort. *Id.* They are as follows:

> (1) the defendant engaged in conduct which "passed off" its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization.

*Brainard v. Vassar*, 561 F. Supp. 2d 922, 937 (M.D. Tenn. 2008) (quoting *Sovereign Order*, 119 F.3d at 1243). There are no facts whatsoever in the Amended Complaint or in the record generally

that indicate that any of the Defendants engaged in conduct that "passed off" their organization or services as that of UDT, that they acted with intention to deceive the public, or that the public was deceived as to the source of services offered. In its discovery requests to UDT, Defendants requested that UDT "[p]roduce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Wrightcore, Byers, Hicks, Hicks, Stinson, Morse, and/or Self unfairly competed with UDT in violation of Tennessee common law." UDT responded, "Plaintiff shall produce any such non-privileged documents. Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been denied access." (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 15.) Despite this response, no responsive documents have been forthcoming, and UDT has put forth no evidence in support of its claim that Defendants are in possession of such documents, or that they have denied UDT access to anything. Defendants are entitled to summary judgment as to UDT's claim of unfair competition.

**G.     COUNT IV - Violation of Florida's Deceptive and Unfair Trade Practices Act**

UDT claims that Defendants Byers, Wrightcore, Hicks, Stinson, Self and Morse violated the FDUTPA by willfully and wrongfully misappropriating Confidential Information of UDT and by willfully and wantonly using that information to UDT's detriment. Am. Compl. ¶¶ 82-83. UDT claims further that these Defendants were direct participants in the unfair methods of competition and dealings because each of them misappropriated UDT's Confidential Information, worked for a competitor during the term of their employment at UDT, and concealed from UDT such unfair and deceptive acts. Id. ¶ 84.

UDT's claim for violation of the FDUTPA, Fla. Stat. § 501.201 *et seq.*, fails as a matter of law. First and foremost, the FDUTPA does not apply to any of the Defendants because none of the Defendants, excepting Defendants Hicks, Stinson, and Self concerning the interpretation of their RCAs with UDT, are subject to Florida law. Nonetheless, even assuming Florida law applies,

UDT's claim for violation of the FDUTPA fails because there is no proof at all (or, for that matter, a single allegation) of injury or detriment to consumers. Beyond even this, there is no proof that any of these Defendants misappropriated UDT's Confidential Information (see Section A), worked for a competitor during the term of their employment at UDT (see Section E), or concealed such actions from UDT.

**1. Florida's Deceptive and Unfair Trade Practices Act Does Not Apply Against Any of these Defendants.**

UDT cannot allege a violation of Florida's Deceptive and Unfair Trade Practices Act against Defendants Byers, Wrightcore, Hicks, Stinson, Self, or Morse because it is undisputed that those Defendants are residents of Tennessee whose alleged actions occurred solely while working for UDT or Wrightcore in Tennessee. *See* Am. Compl. For all the reasons outlined in Section A(i), Florida's Deceptive and Unfair Trade Practices Act does not apply against any of the Defendants in this case. Accordingly, the Florida Deceptive and Unfair Trade Practices Act claim fails as a matter of law.

**2. Even Assuming Florida Law Applies, Count IV Fails as a Matter of Law Because UDT Has Failed to Establish the Elements of its FDUTPA Claim.**

To state a claim under FDUTPA, a party must allege (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045, 1056 (S.D. Fla. 2009). The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." §501.204(1), Fla. Stat. (2011). The term "trade or commerce" is defined as "advertising, soliciting, providing, offering, or distributing whether by sale, rental, or otherwise, of any good or service, or any property ... or any other article, commodity, or thing of value, wherever situated." § 501.203(8). An unfair action under FDUTPA is an act that offends established public policy, and one that is substantially injurious to consumers, unscrupulous, oppressive, unethical, or

27

immoral. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003). Deception occurs if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment. *Id.*; *State v. Beach Blvd. Auto., Inc.*, 139 So.3d 380, 386-87 (Fla. App. 2014). While a non-consumer entity may have standing to bring a FDUTPA claim, the law is clear that such a claimant must "prove that there was an injury or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim." *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*, 169 So.3d 164, 169 (Fla. App. 2015).

As set forth herein, the FDUTPA does not apply to Defendants, all Tennessee residents who acted solely in Tennessee. Even if Defendants were subject to Florida law, UDT's FDUTPA claim fails as a matter of law because UDT has not produced any evidence of consumer injury or detriment; indeed, UDT does not even allege such. UDT is not a consumer of Wrightcore or of any of the individual Defendants now, or when they were employed by UDT. The purpose of the FDUTPA is to protect individual and business consumers from unfair and deceptive trade practices. *See, e.g.*, Fla. Stat. Ann. § 501.202. UDT cannot show that it is a "consumer" viz a viz the Defendants for purposes of this case. Because UDT cannot prove a necessary element of its claim for violation of the FDUTPA, this claim fails as a matter of law.

## H.     COUNT VI - Civil Conspiracy

UDT claims that all of the Defendants conspired to set up a company to sell goods and services directly in competition with UDT by misappropriating UDT's Confidential Information, and that Defendants' conspiracy involved misappropriation of UDT's trade secrets, breach of the Defendants' duty of loyalty to UDT, and undermining UDT's business while Byers and others were still employed by UDT. *Id.* ¶¶ 93-94. UDT further claims that Defendants Byers and Wrightcore conspired to tortiously interfere with UDT's rights under its RCAs with Defendants Hicks, Stinson,

28

and Self. *Id.* UDT claims that in order to facilitate the conspiracy, Defendants took deliberate actions, including downloading, e-mailing, and otherwise exchanging Confidential Information belonging to UDT without UDT's knowledge, and storing UDT's Confidential Information on cloud storage services for which they maintained passwords that were not shared with UDT, so they could retrieve and use it after they left UDT. *Id.* ¶ 95. UDT's conspiracy claim fails as a matter of law against all of the Defendants because UDT has failed to present any evidence of a common design between the Defendants. UDT has further failed to show that the Defendants sought to accomplish an unlawful purpose or a lawful purpose by unlawful means, and that the Defendants took an overt act in furtherance of their alleged conspiracy.

The elements of a civil conspiracy in Tennessee are (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to the person or property resulting in attendant damage. *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993). Civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *See Hauck Mfg. Co. v. Astec Indus., Inc*., 375 F. Supp. 2d 649, 660 (E.D. Tenn. 2004).

UDT admits that, beyond the exhibits discussed above, none of which constitute evidence of a conspiracy, it has found no documents that support its position that Byers and the other Defendants conspired to unlawfully steal the business of UDT. *Id.* 159:7-22. Indeed, in its discovery requests to Plaintiff, Defendants requested that UDT "[p]roduce any and all evidence of any nature whatsoever supporting your allegation that Defendant(s) Wrightcore, Byers, Hicks, Stinson, Morse, Self, Bryant, Stovall, and/or Davis conspired to wrongfully compete with UDT." UDT responded, "Plaintiff shall produce any such non-privileged documents. Further answering, Plaintiff states that most if not all of such documents are in the possession of Defendants, to which Plaintiff has been

29

denied access." (Pl.'s Resp. to Defs.' First Interrog. and Request for Prod. No. 13.) Despite this response, no responsive documents have been forthcoming, and UDT has put forth no evidence in support of its claim that Defendants are in possession of such documents, or that they have denied UDT access to anything.

Beyond these admissions, it is clear that UDT has failed to demonstrate the existence of a conspiracy. First, as outlined above, UDT has failed to put forth evidence that the Defendants committed any of the torts underlying their alleged conspiracy. UDT has offered no evidence in support of its claims that the Defendants misappropriated its Confidential Information or trade secrets (see Section A), or that Defendants breached their duties of employment loyalty to UDT or otherwise undermined UDT's business while still employed by UDT (*see* Section E). Further, UDT cannot show that Byers and Wrightcore tortiously interfered with UDT's rights under its RCAs with Defendants Hicks, Stinson, or Self. (*see* Sections B-D) These facts alone preclude UDT's conspiracy claim. Further, UDT has further failed to identify an overt act in furtherance of the alleged conspiracy, and to identify, by testimony or evidence, a common design between two or more persons. UDT has wholly failed to support its claim of conspiracy against the Defendants. This claim therefore fails as a matter of law.

## V. ARGUMENT PERTAINING TO DEFENDANTS' COUNTERCLAIMS

Defendant Byers is entitled to summary judgment on his claim for commissions against UDT. Under Tennessee law, commissions are to be paid within fourteen days after the date of an employee's termination. Tenn. Code Ann. § 47-50-114. Additionally, as set forth in Defendants' Counterclaim, ¶ 42, Byers is owed commissions pursuant to his employment agreement with UDT.

In testimony by UDT's corporate representative, UDT admitted that it withheld the $50,000.00 commission it owed to Byers and placed it in its attorney's escrow account. Cline Dep. 155:8-19, 156:20-24. While Cline testified that UDT put the commissions in escrow with UDT's

attorney to "ensure clean hands," doing so does not constitute good faith. UDT has not articulated any reason for not paying Byers what he is owed and instead putting Byers' commission in escrow. It has been more than two years since Byers was terminated. UDT's failure to pay commissions that it knows are due to Byers constitutes bad faith, entitling Byers not only to payment of the commission, but also to exemplary damages of three times the damages owed, plus attorneys' fees and court costs. Tenn. Code Ann. § 47-50-114. Alternatively, under Tennessee common law, Byers is owed the full amount of his commissions, plus interest.

## VI.  CONCLUSION

For all the foregoing reasons, there is no genuine dispute as to any material fact, and UDT's claims against Defendants fail as a matter of law. UDT is wasting Defendants' and the Court's time and resources by trying to extend the non-solicitation and other obligations of the RCAs to the Defendants who didn't sign them. While UDT asserts what could have happened and what they assume happened, they have offered no evidence of wrongdoing on behalf of any of the Defendants. Accordingly, Defendants respectfully submit that the Court should (1) grant their Motion for Summary Judgment, pursuant to Rule 56, (2) grant Defendants an award from UDT of their attorneys' fees and costs incurred in defending this action, pursuant to Section 24 of the RCAs at issue herein, (3) grant Byers' claim for his unpaid commissions; and (4) grant Defendants such other and further relief as the Court deems equitable and appropriate under the circumstances.

Respectfully submitted,

/s/ Martha L. Boyd
Martha L. Boyd (TN BPR No. 22029)
Mark Baugh (TN BPR No. 15779)
Charles C. McLaurin (TN BPR No. 34352)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
211 Commerce Street, Suite 800
Nashville, Tennessee  37201
Telephone:  (615) 726-5652
Facsimile:  (615) 744-5652
Email:  mboyd@bakerdonelson.com
         mbaugh@bakerdonelson.com
         cmclaurin@bakerdonelson.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 21, 2018, a true and correct copy of the foregoing document was filed electronically.  Notice was served on the parties listed below via the Court's ECF systems and/or via U.S. Mail, postage prepaid: Timothy L. Warnock, Riley Warnock & Jacobson, PLC, 1906 West End Avenue, Nashville, Tennessee 37203 and Ronald M. Rosengarten, Greenberg Traurig, P.A., 333 S.E. 2nd Avenue, Suite 4400, Miami, Florida 33131.

/s/ Martha L. Boyd
Martha L. Boyd